**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

**CASE NO. 6:25-cv-01613**

DANIEL INTERNICOLA,
individually and on behalf of
others similarly situated,

Plaintiffs,

v.

MORTGAGEPROS, LLC,

Defendant.
_________________________________/

**DEFENDANT MORTGAGEPROS, LLC'S MOTION TO DISMISS**

Defendant MortgagePros, LLC ("**MPros**" or "**Defendant**"), moves to dismiss the amended putative Class Action Complaint (ECF No. 13; "**FAC**") filed by Plaintiff Daniel Internicola ("**Plaintiff**" or **"Internicola"**) for failure to state a claim under the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "**TCPA**") or the regulations found at 47 C.F.R. § 64.1200. The Court should thus dismiss the FAC.

## I. INTRODUCTION

Internicola brings a putative class action against MPros, alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") and seeking monetary, injunctive, and declaratory relief. His claims are brought pursuant to section 227(c)(5) of the TCPA, purporting to arise out of violations of 47 C.F.R. §§ 64.1200(c) and (d). However, Plaintiff's claims are subject to dismissal as a matter of law pursuant to Fed. R. Civ. P. 12(b)(6) for the following reasons:

First, 47 U.S.C. § 227(c)(5) provides a limited right of action to any person who "has received more than one **telephone call** within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." (emphasis added). The statute unambiguously applies only to telephone calls, not to the text messages at issue in Plaintiff's claims.

Second, the FAC's allegations make plain that MPros complied with the opt-out requirements within the time period provided by 47 C.F.R. § 64.1200(d)(3). That compliance renders nearly every communication identified in the FAC outside the scope of the regulation. To the extent that any communications fall within the scope of the regulation following MPros's processing of Plaintiff's opt-out, those communications are expressly alleged to be text messages and are not actionable under 47 U.S.C. § 227(c)(5) for the same reason stated in the previous paragraph.

Third, Plaintiff may not maintain a claim for alleged violation of 47 C.F.R. § 64.1200(c). 47 U.S.C. § 227(c)(5) provides a right of action to any person who "has received more than one telephone call within any 12-month period by or on behalf of the same entity *in violation of the regulations prescribed under this **subsection***" (emphasis added). However, 47 C.F.R. § 64.1200(c) was not prescribed pursuant to 47 U.S.C. § 227(c), Rather, it was prescribed pursuant to 15 U.S.C. § 6153 and that statute does not provide a private right of action.

## II. LEGAL STANDARD

To survive a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A claim should only be considered facially plausible when "plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To satisfy the plausibility standard, Plaintiff must set forth "more than a sheer possibility that a defendant has acted unlawfully." *Id*.

While a plaintiff is not obligated to plead factual allegations in great detail, "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff must "include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1254 (11th Cir. 2012). Finally, Plaintiff's allegations must be well-founded, as a recitation of "[f]actual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).

## III. ARGUMENT

### 1. 47 U.S.C. § 227(c)(5) Does Not Apply To Text Messages

#### i. Ordinary Principles of Statutory Interpretation Limit § 227(c)(5)'s Scope to Calls

When "interpreting a statute, [courts] start with the plain language of the provision to be interpreted." *Pugliese v. Pukka Dev., Inc.*, 550 F.3d 1299, 1303 (11th Cir. 2008). With respect to 47 U.S.C. § 227(c)(5), the plain language is dispositive that the statute does not apply to text messages, as was recently recognized by this District in *Aliana El Sayed v. Naturopathica Holistic Health, Inc.*, 25-cv-00847-SDM-CPT, ECF 27 (M.D. Fla. Oct. 24, 2025) ("I agree . . . that 'the statutory text here is clear, and a text message is not a 'telephone call.'").[1]

---

[1] The same conclusion that text messages are not telephone calls for purposes of § 227(c)(5) was recently reached by the Chief Judge in the Northern District of Florida in *Davis v. CVS Pharm., Inc.*, 2025 U.S. Dist. LEXIS 167366 (N.D. Fla. Aug. 26, 2025). In addition to the statutory interpretation arguments that MPros sets forth herein, Chief Judge Winsor observed

Specifically, 47 U.S.C. § 227(c)(5) affords a private right of action to "[a] person who has received more than one **telephone call** within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection . . ." (emphasis added). Absent from this clause is any indication that the scope of the provision extends to text messages.

As the Supreme Court recently reiterated, a "statute's meaning is fixed at the time of enactment." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024) (*citing Wis. Cent. Ltd. v. U.S.*, 585 U.S. 274, 284 (2018) ("Written laws are meant to be understood and lived by. . . . That is why it is a fundamental cannon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute.") (internal quotations and citation omitted)). Thus, to properly interpret the term "telephone call" in § 227(c), recognizing that no ordinary person at the time that the TCPA was drafted and enacted in 1991 would have even known what a text message is let alone have understood it to be synonymous with a telephone call is critical and dispositive (though it is also helpful to recognize that no ordinary person in the year 2025 would understand the term "telephone call" to mean "text message" either.)

It is equally noteworthy that the TCPA has been amended subsequent to its enactment to include explicit uses of the term text message in subsections (e),[2] (i), and

---

that use of the phrase "telephone call or message" in 47 U.S.C. § 227(a)(4)'s definition of "telephone solicitation" results in the conclusion that when the term "telephone call" is used in isolation in the statute Congress intended for that term to not include all messages, underscoring that Congress deliberately utilized different words in different sections of the statute to mean different things. *Id.* at *7.

[2] The TCPA was amended in 2018 to include subsection (e)'s text message language. *See* Pub. L. 115-141.

(j).[3] 47 U.S.C. § 227(i)(1)(A) reads "a call made ***or*** text message sent . . ." and that 47 U.S.C. § 227(i)(1)(B) similarly reads "a call ***or*** text message . . ."(emphases added). The language of 47 U.S.C. § 227(e)(8)(A) and (B) draws an equally sharp distinction between a call and a text message. Specifically, both § 227(e)(8)(A) and (B) include the same identical phrasing: "a call made using a voice service ***or*** a text message sent using a text messaging service." (emphasis added). Together, the language in these TCPA provisions demonstrate conclusively Congress's understanding that a call and a text message are not one in the same.

Congress has amended the TCPA on multiple occasions to ensure that the scope of various of the statute's restrictions was broad enough to explicitly cover both telephone calls and text messages. But it has notably not done so with respect to § 227(c)(5). "When Congress uses different terms, [courts] expect that [those terms] hold different meanings." *Fernandez v. Seaboard Marine Ltd.*, 135 F.4ht 939, 958 (11th Cir. 2025). In the TCPA, one portion of the statute uses the term(s) "call or text message" while another merely uses the term "telephone call." The only permissible conclusion to reach from this difference is that the latter term is intentionally narrower than the former. Simply stated, telephone call as used in § 227(c)(5) does not include text messages.

ii. <u>The FCC's Interpretation of the Statute is Not Binding on the Court</u>

In *Loper Bright*, through which the Supreme Court overturned the *Chevron* deference doctrine, the Supreme Court reiterated that it the traditional function of courts "to decide whether the law means what the agency says." *Loper Bright*, 603 U.S. 369,

[3] The TCPA was amended in 2019 to include the text message language in sections (i) and (j). *See* Pub. L. 116-105.

392 (2024). Thus, notwithstanding the Federal Communications Commission's ("FCC") proclamation in its 2003 rulemaking that the term "call" for TCPA purposes "encompasses both voice calls and text calls," 18 FCC Rcd. 14014 ¶ 165 (2003) (the "2003 Order"), the Court need not defer to the interpretation.[4]

In the 2003 Order, the FCC did not cite to any statutory support for its conclusion that the term "call" encompasses a text message.[5] Of course, the reason for that silence is readily apparent – no statutory basis exists for that conclusion. The FCC instead proclaimed that the interpretation was consistent with its understanding of the TCPA's policy goals. 18 FCC Rcd. 14014 ¶ 165. However, "between policy arguments and the statutory text . . . the text [of the Act] must prevail." *UMG Recordings v. Grande Comm. Networks*, 118 F.4th 697, 723 (5th Cir. 2024).

It is the Court that has the appropriate authority to interpret the TCPA's text, not the FCC. This has been reaffirmed by the Supreme Court in both *Loper Bright* and *McLaughlin Chiropractic*. While *McLaughlin Chiropractic* calls for "appropriate respect" to be afforded to the FCC's interpretation, the Court "can provide appropriate respect to

---

[4] To the extent that the Hobbs Act might have otherwise compelled the Court to defer to the FCC's interpretation even after *Loper Bright*, that shackle has been unbound as well. In *McLaughlin Chiropractic Assocs. V. McKesson Corp*., 606 U.S. 146, 168 (2025), the Supreme Court held that in enforcement proceedings district courts are not "bound by the FCC's interpretation of the TCPA," and that instead it "should interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation."

[5] Moreover, the 2003 Order which purported to bring text messages within the definition of "call" did so within the context of § 227(b), not § 227(c). Underscoring this point are that the FCC (1) explicitly mentioned "automatic telephone dialing system," "artificial or prerecorded message," and "automated or prerecorded telephone calls," and (2) cited only to 47 U.S.C. § 227(b) and the implementing regulation of that provision, 47 C.F.R. 64.1200(a). See, e.g., *Jones v. Blackstone Med. Servs., LLC*, 2025 U.S. Dist. LEXIS 138371, at *11-12 (C.D. Ill. July 21, 2025).

[the] agency's view without adopting a statutory interpretation that conflicts with the ordinary public meaning of clear statutory text." *Davis v. CVS Pharm, Inc.*, 2025 U.S. Dist. LEXIS 167366, at *9.

The FCC's policy-based interpretation cannot rewrite the TCPA's clear text. In fact, because this policy-based interpretation conflicts with the text, the Court should disregard it, exercise its own independent judgment, and appropriately conclude that the unambiguous terms of § 227(c)(5) do not apply to text messages.

iii. <u>47 C.F.R. § 64.1200(e) Does Not Render 47 U.S.C.§ 227(c)(5) Applicable to Text Messages</u>

47 C.F.R. § 64.1200(e) provides that "[t]he rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing or text message calls or text messages to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153. 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.'" For three distinct reasons, however, this provision does not alter the fact that 47 U.S.C. § 227(c)(5) does not apply to text messages.

<u>First</u>, the provision itself contains language limiting its scope: "to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153. 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.'" As indicated in note 5 above, the extent to which the FCC's 2003 Order described text messages was within the context of § 227(b), not § 227(c). And so, by the FCC's own limitation, the provision does not serve as a mechanism to broaden the scope of 47 U.S.C. § 227(c)(5)'s coverage to text messages.

<u>Second</u>, and as explained in further detail below, Congress imposed a deadline

by which the FCC was to prescribe rules purporting to "implement methods and procedures for protecting the privacy rights" of residential telephone subscribers. That deadline, set by 47 U.S.C. § 227(c)(2) to be not later than September 21, 1992, had long since passed by the time that the FCC had both amended 47 C.F.R. § 64.1200 to include subsection (e), 68 FR 44144 (2003), and then later revised the subsection to include the words "text message," 89 FR 5098 (2024).[6] Consequently, the Court must refuse to apply it in a manner that rewrites the text of 47 U.S.C. § 227(c)(5), as the rule is otherwise void and unenforceable by virtue of the FCC's lack of statutory authority to prescribe it. [7]

Third, the FCC, like every other executive agency, has no authority to rewrite the terms of legislation. "Atextual good policy cannot overcome clear text." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 315 (11th Cir. 2025) (citing *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."); and *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017) (observing that an agency's opinion that its rule is "good policy" "does not change the statute's text")).

The statutory text of 47 U.S.C. § 227(c)(5) is clear that the private right of action

[6] While MPros disputes that 47 C.F.R. § 64.1200(e) serves as a legitimate basis to broaden the scope of 47 U.S.C. § 227(c)(5) to apply to text messages in addition to telephone calls, in the event that the Court disagrees then MPros notes that the effective date of the amendment to 47 C.F.R. § 64.1200(e) which revised the language to include the word "text messages" occurred within the time period through which the putative class is defined. As a result, any putative class member whose alleged claim arose from receipt of texts prior to that date would not possess a viable claim against MPros under any interpretation of 47 U.S.C. § 227(c)(5).

[7] As MPros explains in detail further hereinbelow, the expiration of this statutory deadline served to terminate all rulemaking authority conferred on the FCC to prescribe regulations under § 227(c).

is conferred to recipients of one or more telephone calls, not to recipients of text messages. The FCC has no authority to dictate otherwise. *Ins. Mkt. Coal. Ltd.*, 127 F.4th at 315. As a result, the Court should reject any entreaty to enforce 47 C.F.R. § 64.1200(e) so as to rewrite the TCPA's clear statutory text.

**2. MPros' Compliance with the IDNC Regulations**

47 C.F.R. § 64.1200(d) provides that "[n]o person or entity shall initiate . . . any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." Subsection (3) thereof provides one of the "minimum standards" for such procedures concerning recording and disclosure of do-not-call requests. As relevant here, it provides that "[p]ersons or entities making such calls . . . must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed ten (10) business days from the receipt of such receipt . . . " *Id.*

The allegations in the FAC demonstrate that Plaintiff's opt-out request was honored not only within the 10 business days permitted by the regulation but was also done so within a reasonable amount of time before that 10 day period had lapsed.[8] Specifically, Plaintiff alleges that he purportedly revoked his prior express consent to receive calls on July 1, 2025, ECF 13 ¶ 45, and that the last of the messages received thereafter occurred on July 9, 2025. *Id*. at ¶¶ 69-71. What the foregoing allegations

[8] For the reason set forth in Section 3, MPros submits that the FCC lacked the statutory authority to amend the IDNC regulation subsequent to its initial promulgation and that, as a result, the requirement to either honor such request within 10 days (§64.1200(d)(3), 89 FR 82518 (2014)) and/or to honor such request for a period of 5 years (§64.1200(d)(6), 68 FR 44144 (2003)) are unenforceable as a matter of law because neither were included in the initial 1992 rulemaking.

evidence is that, when accounting for the fact that July 4, 2025 was a federal holiday, Plaintiff's alleged opt-out was honored in 5 business days and was processed in only half of the amount of time allotted by the regulation. By any measure, this is compliance with both the letter and spirit of the regulation.

As a result, none of the calls or text messages purportedly received by Plaintiff prior to MPros's processing of his alleged opt-out request (i.e., those communications received between July 1 and July 9, 2025) are actionable as alleged violations of 47 C.F.R. §64.1200(d) because 47 U.S.C. § 227(c)(5) unambiguously provides a right of action *only* for those telephone calls which were received *in violation of the regulations prescribed under the subsection*. Thus, to the extent that any of the communications at issue in the FAC implicate 47 C.F.R. § 64.1200(d), they are those communications identified at paragraphs 76 and 77. However, the communications identified at FAC paragraphs 76 and 77 are expressly alleged to have been text messages. Consequently, for the reasons demonstrated in the foregoing section, the alleged September 16 and 18, 2025 communications are not actionable because there is no private right of action under § 227(c)(5) arising out of those text messages.

**3. There is No Private Right of Action for Alleged Violations of 47 C.F.R. § 64.1200(c)(2)**

47 U.S.C. § 227(c) is unique. Whereas 47 U.S.C. § 227(b) broadly applies to any call placed with either automated or prerecorded or artificial message technology, provides a private of action to any recipient of such a call placed without his/her prior express consent, and confers perpetual rulemaking authority upon the FCC to prescribe regulations to implement the subsection, 47 U.S.C. § 227(c) is far more limited in scope and thus stands in stark contrast to §227(b).

Section 227(c) clearly and unambiguously applies only to one particular kind of call (telephone solicitations) rather than to any call, provides a private right of action only to those recipients of two or more telephone calls placed in violation of regulations prescribed pursuant to the subsection, and confers rulemaking authority upon the FCC that (i) expressly imposes a deadline by which such regulations must be prescribed and (ii) explicitly includes minimum substantive requirements mandated of certain such regulations prescribed pursuant to that grant of authority, including regulations concerning establishment and operation of a national database of telephone numbers of residential subscribers who object to receiving telephone solicitations.

The difference in breadth and scope between § 227(b) and § 227(c) is unsurprising. When Congress enacted the TCPA, it considered automated telephone calls to be a far greater concern than live solicitations. *Wilson v. Skopos Fin., LLC*, 2025 U.S. Dist. LEXIS 138638, at *11 (D. Or. July 21, 2025) ("Congress found that automated prerecorded telephone calls were a greater nuisance and invasion of privacy than live solicitation calls") (internal citation omitted). That difference in concern is reflected by the limiting language throughout § 227(c). In turn, that limiting language reveals that the TCPA does not provide a private right of action for alleged violations of 47 C.F.R. § 64.1200(c)(2).

i. <u>§ 227(c) Expressly Limits the Scope of the FCC's Rulemaking Authority</u>

a. <u>The Statute Imposes a Deadline By Which § 227(c) Rules Were to be Prescribed</u>

In two separate provisions, Congress unequivocally limited the FCC's rulemaking authority under 47 U.S.C. § 227(c) in a manner that imposed a deadline by which the FCC was to prescribe § 227(c) regulations.

<u>First</u>, 47 U.S.C. § 227(c)(1) provides that "[w]ithin 120 days after enactment of

this section [enacted Dec. 20, 1991], the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitation to which they object."

Second, 47 U.S.C. § 227(c)(2) then goes on to provide that "[n]ot later than 9 months after the date of enactment of this section [enacted Dec. 20, 1991], the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph . . .".

Through these two sections, Congress imposed two deadlines upon the FCC: first, a rulemaking proceeding was to be initiated no later than April 18, 1992; and second, that rulemaking proceeding was to be concluded and regulations to implement methods and procedures for protecting the privacy rights described in 47 U.S.C. § 227(c)(1) were to be prescribed no later than September 20, 1992.

Subsequent to the TCPA's enactment, the FCC understood its assignment. Accordingly, on April 17, 1992 the FCC initiated a Notice of Proposed Rulemaking in which it proposed and sought comment on certain TCPA-related regulations. 7 FCC Rcd 2736 (1992). Thereafter, on September 17, 1992, the FCC adopted the initial rules to implement the TCPA, which were subsequently released on October 16, 1992 and published in the federal register thereafter on October 23, 1992. *See* FCC 92-443 and CC Docket No. 92-90. These rules comprise the universe of rules permissibly prescribed within the statutory authority conferred on the FCC. Any other rules purporting to implement § 227(c) but which were (i) prescribed pursuant to a rulemaking proceeding which was initiated later than April 18, 1992 and/or (ii) promulgated later than September 20, 1992, were enacted by the FCC in excess of authority granted to it by § 227(c).

The TCPA's other operative subsections demonstrate that Congress deliberately imposed the deadline set by § 227(c). Contrast the time limitations included in §§ 227(c)(1) and (2) with the broad perpetual grant of rulemaking authority of § 227(b)(2) ("The Commission shall prescribe regulations to implement the requirements of this subsection."), § 227(d)(2) ("The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require . . ."), § 227(d)(3) ("The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone."), and § 227(e)(3) ("The Commission shall prescribe regulations to implement this subsection.").

The time-limited rulemaking authority of § 227(c) shares a much closer resemblance to the rulemaking authority conferred by § 227(i)(1) and § 227(j)(1), both of which also contain specific deadlines by which Congress mandated any rules pursuant to those grants of authority were to be prescribed. *See* § 227(i)(1) ("Not later than 18 months after the date of the enactment of this subsection [enacted Dec. 30, 2019], the Commission shall prescribe regulations to establish a process that streamlines the ways in which a private entity may voluntarily share with the Commission information relating to . . .") *and* § 227(j)(1) ("Not later than 1 year after the date of the enactment of this subsection [enacted Dec. 30, 2019], shall take a final agency action to ensure the robocall blocking services provided on an opt-out or opt-in basis pursuant to the Declaratory Ruling of the Commission in the matter of Advanced Methods to Target and Eliminate Unlawful Robocalls (CG Docket No. 17-59; FCC 19-51; adopted on June 6, 2019).").

b. § 227(c) Imposes Minimum Requirements Not Met By 47 C.F.R. § 64.1200(c)(2)

47 U.S.C. § 227(c)(3) delegates discretion to the FCC as to whether to prescribe regulations requiring the establishment and operation of a national do-not-call registry ("NDNC"). It also imposes conditions upon the FCC in the event that the FCC exercised that discretion in the affirmative.

First, § 227(c)(3) mandates that that any regulations establishing and/or operating the NDNC, if prescribed, were to be prescribed among the regulations required by 47 U.S.C. § 227(c)(2), which in turn were to be prescribed not later than 9 months after the TCPA's enactment. The FCC exercised its discretion at the completion of the rulemaking mandated by § 227(c)(1) and ultimately opted not to include an NDNC among the regulations mandated by § 227(c)(2).

Substantive conditions were also imposed. Specifically, while § 227(c)(3) generally leaves to the FCC's discretion the decision as to whether to establish an NDNC ("The regulations required by paragraph (2) ***may*** require the establishment and operation of a single national database . . .") (emphasis added), it makes clear that in the event that the FCC exercises that discretion in favor of establishing the NDNC then the regulations must meet certain minimum requirements. ("If the Commission determines to require such a database, such regulations ***shall*** . . .") (emphasis added). However, just as promulgation of § 64.1200(c)(2) did not comply with the §227(c)'s time condition, it (and the other NDNC-related regulations in § 64.1200) similarly do not comply with the substantive conditions imposed by §§ 227(c)(3)(A)-(L) and (4)(A)-(C).

Among the mandatory minimum requirements absent from both 47 C.F.R. § 64.1200 generally, and subsection (c)(2) thereof specifically, are the following:

- Specification of a method by which the FCC would select an entity to administer the database[§ 227(c)(3)(A)];

- Specifications of the methods by which telephone subscriber objections shall be collected and added to the database [§ 227(c)(3)(D)];

- Prohibitions against residential subscribers from being charged for giving or revoking of objections to telephone solicitations or for being included in the database [§ § 227(c)(3)(E)];

- Specifications regarding the methods by which a person desiring to make or transmit telephone solicitations will obtain access to the database, by area code or local exchange prefix, to avoid calling the telephone numbers included in the database, and the costs to be recovered from such person [§ 227(c)(3)(G)];

- Specifications regarding the methods for recovering, from persons accessing the database, the costs involved in identifying, collecting, updating, disseminating, and selling, and other activities relating to, the operations of the database that are incurred by the entities carrying out those activities [§ 227(c)(3)(H)]; and

- Specifications regarding the frequency with which the database will be updated and the method by which such updating will take effect for purposes of compliance with the database-related regulations [§ 227(c)(3)(I)];

Section 227(c)(4) continues, using "[t]he Commission shall" language to impose additional minimum requirements for regulations "[i]f the Commission determines to require the database mechanism described in paragraph (3)." Again, however, the FCC's NDNC-related regulations fail to comply with the statute. This failure is borne out through 47 C.F.R. § 64.1200's lack of provision for the "develop[ment] of a fee schedule or price structure for recouping the cost of such database that recognizes the differences [of telemarketers that conduct business on a national, regional, State, or local level] and (i) reflect[s] the relative costs of providing a national, regional, State, or local list of phone numbers of subscribers who object to receiving telephone solicitations; and (ii) reflect the relative costs of providing such lists on paper or electronic media . . ." - requirements

imposed by § 227(c)(4)(B).

The reason for the FCC's failure to comply with the minimum requirements set forth in §§ 227(c)(3) and (4)[9] when prescribing its NDNC-related regulations is straightforward. As explained in the following section, the FCC's NDNC-related regulations were not prescribed pursuant to a grant of authority by § 227(c), but rather were prescribed pursuant to a later grant of authority by 15 U.S.C. § 6153, which does not contain any of the minimum requirements enumerated by § 227(c)(3) or (4).

ii. The FCC's NDNC-related regulations were prescribed pursuant to 15 U.S.C. § 6153.

In the FCC's 1992 Report and Order, it stated that "[t]he NPRM in this proceeding requested comments on proposed regulations implementing the TCPA and comments on several proposals restricting telephone solicitations to residential telephone subscribers. The Commission has considered all comments and has adopted regulations to implement the prohibitions and technical requirements mandated by the TCPA as well as regulations which allow consumers to avoid unwanted telephone solicitations through placement on company-specific do-not-call lists." FCC 92-443.

Notably, the FCC made the affirmative decision not to establish a national do-not-call list during this rulemaking proceeding, later describing the basis for that decision as follows: "[i]n declining to adopt a national do-not-call list in 1992, the Commission concluded that a national database would be costly and difficult to establish and maintain in a reasonably accurate form. The Commission found that frequent updates

[9] Neither the Notice of Proposed Rulemaking which re-proposed the FCC's establishment of an NDNC, 67 FR 62667 (2002), nor the rulemaking through which the FCC's NDNC-related regulations were ultimately adopted, 68 FR 44144 (2003), reflect the FCC's consideration of any of the other factors mandated by either §§ 227(c)(4)(A) or (C).

would be required, regional telemarketers would be forced to purchase a national database, costs might be passed on to consumers, and the information compiled would present problems in protecting consumer privacy." 67 FR 62667, *62676 ¶ 41 (1992).

Congress provided the FCC with discretion over the decision of whether or not to establish the NDNC. It exercised that discretion and opted not to establish one within the time permitted by Congress to do so. In response to the FCC's exercise of that discretion, Congress took independent steps which ultimately culminated in the NDNC's creation. These steps demonstrate that the FCC's authority to promulgate NDNC-related regulations arose not from the TCPA but from separate statutory authority.

First, Congress enacted the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. § 6101 et seq.) (the "Telemarketing Act"). The Telemarketing Act, among other things, directs the Federal Trade Commission ("FTC") to issue a rule prohibiting both deceptive and abusive telemarketing acts or practices. *See* 15 U.S.C. § 6102(a). That rule became known as the Telemarketing Sales Rule, 16 C.F.R. § 310.1 *et seq.* ("TSR"). Among the provisions of the TSR as initially prescribed was a company-specific do-not-call provision at § 310.4(b)(1)(ii) similar to that which had been prescribed by the FCC in its 1992 rulemaking.

The Telemarketing Act directed the FTC to conduct a review of the TSR five years after its promulgation and to report the results of the review to Congress. *See* 15 U.S.C. § 6108. As part of that mandatory review, the FTC published in the Federal Register a notice indicating that it would conduct a forum examining issues related to the TSR's do-not-call provision. *See* 64 FR 66124 (Nov. 24, 1999).

Moreover, in contrast to the time-limited grant of rulemaking authority Congress delegated in 47 U.S.C. § 227(c), the Telemarketing Act confers perpetual rulemaking

authority on the FTC. 15 U.S.C. § 6102(a)(1) ("The Commission shall prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices."). Thus, based on the record developed during the FTC's TSR Rule Review, including from the do-not-call related forum, the FTC published a Notice of Proposed Rulemaking on January 30, 2002 proposing revisions to the TSR, among which included the creation of a national do-not-call registry. *See* 67 FR 4492 (2002). The subsequent Final Rule effectuating the proposed revisions and formally establishing the NDNC was published on January 29, 2003. *See* 68 FR 4580 (2003).

Against a backdrop of uncertainty as to the FTC's legal authority to establish a national do-not-call registry, Congress took its second step on March 11, 2003 by enacting the Do Not Call Implementation Act (the "DNC Act"). *See* Public Law 108-10; 15 U.S.C. § 6151 *et seq*. And to settle that uncertainty, the DNC Act first expressly states at 15 U.S.C. § 6151(a) that the FTC has the authority to implement and enforce a national do-not-call registry pursuant to the Telemarketing Act; and thereafter expressly states at 15 U.S.C. § 6151(b) that the provision of the TSR which had been amended to establish the NDNC (16 C.F.R. § 310.4(b)(1)(iii)) was formally ratified.

In recognition that the FTC's jurisdiction over telemarketing is limited in scope and does not extend to common carriers (such as telephone companies and airlines), insurance companies, banks, credit unions, political solicitations, or intrastate telemarketing calls, the DNC Act expressly mandates regulations from the FCC so that if one of those entities not covered by the TSR's NDNC rule were to make an offending call, a prospective violation would not otherwise fall through the cracks. Thus, 15 U.S.C. § 6153 confers on the FCC explicit rulemaking authority. While similar to 47 U.S.C. § 227(c) as far as providing a deadline by which the FCC was to promulgate rules

contemplated by Congress, 15 U.S.C. § 6153 differs from § 227(c) as far as it grants mandatory, rather than discretionary, NDNC-related rulemaking authority, providing that "the Federal Communications Commission shall issue a final rule".

In order to ensure that the FCC could meet § 6153's deadline to prescribe the rules mandated by the statute, Congress identified an ongoing rulemaking proceeding that the FCC had initiated prior to the DNC Act's enactment, and directed that it be the vehicle through which the FCC prescribed the mandatory NDNC-related regulations. Similarly, Congress recognized both that the deadline by which the FCC could prescribe NDNC-related regulations in compliance with §227(c)(3) and (4) had lapsed, and that with the lapse the FCC's statutory authority to promulgate rules effectuating the goals of those provisions had expired. Therefore, Congress in the DNC Act statutorily provided solutions to the NDNC-related cost considerations that the FCC had previously been tasked with in §§ 227(c)(3) and (4) but had exercised discretion not to regulate within the enumerated timeline, including the setting of a fee schedule. *See* 15 U.S.C. § 6154.

Notably, whereas 15 U.S.C. § 6151 explicitly cited the independent statutory authority pursuant to which Congress sanctioned FTC's NDNC-related rulemaking, 15 U.S.C. § 6153's grant of rulemaking authority to the FCC does not reference § 227(c) as the statutory basis pursuant to which the FCC's NDNC-related regulations would arise. In fact, § 6153's only reference to the TCPA is as a descriptor of the rulemaking proceeding that the FCC had initiated prior to the DNC Act's enactment and through which the FCC was to prescribe the regulations mandated by the DNC Act. Thus, upon examination it is apparent that the FCC prescribed the NDNC-related regulations contained in 47 C.F.R. § 64.1200 not pursuant to any rulemaking authority

conferred by 47 U.S.C. § 227(c) but rather pursuant to the rulemaking authority conferred on it by 15 U.S.C. § 6153.

Nevertheless, the DNC Act does not provide for an independent private right of action. It simply (i) ratifies the FTC's establishment of the NDNC and prohibits expiration of a subscriber's registration of his/her telephone number on the registry, (ii) implements a funding mechanism and corresponding fee schedule, (iii) imposes reporting requirements on the FTC and FCC, and (iv) directs the FCC to prescribe regulations that maximize consistency with the FTC's NDNC-regulations to ensure that compliance obligations flow to entities which telemarket but are otherwise not subject to the limited FTC telemarketing jurisdiction.

Consequently, no private right of action exists for alleged violation of 47 C.F.R. § 64.1200(c)(2), and Plaintiff's claims purporting to arise from alleged violation of that regulation must be dismissed as a result.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, MPros respectfully requests that the Court grant this motion, dismiss the First Amended Complaint, award MPros fees and costs to the fullest extent permitted by law, and grant MPros such further and additional relief as the Court deems just and proper.

**Local Rule 3.01(g) Certification**

Defendant's counsel conferred with Plaintiff's counsel and represents that Plaintiff opposes the relief requested herein.

DATED: October 29, 2025

Respectfully submitted,

KLEIN MOYNIHAN TURCO LLP

By: */s/ Dustin P. Mansoor*
Dustin P. Mansoor
450 7th Avenue – 40th Floor
New York, NY 10123
Telephone: (212) 246-0900
Email: dustin.mansoor@kleinmoynihan.com

*Counsel for Defendant MortgagePros, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 29, 2025, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

*/s/ Dustin P. Mansoor*
Dustin P. Mansoor